**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-5556-16

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

AAKASH A. DALAL,

    Defendant-Appellant.

_____

        Argued January 12, 2021 – Decided April 15, 2021

        Before Judges Fisher, Gilson, and Moynihan.

        On appeal from the Superior Court of New Jersey, Law Division, Bergen County, Indictment No. 13-03-0374.

        Alan L. Zegas argued the cause for appellant (Law Offices of Alan L. Zegas, attorneys; Alan L. Zegas and Joshua M. Nahum, on the brief).

        William P. Miller, Assistant Prosecutor, argued the cause for respondent (Mark Musella, Bergen County Prosecutor, attorney; William P. Miller and John J. Scaluti, Legal Assistant, on the briefs).

PER CURIAM

A jury convicted defendant Aakash Dalal of seventeen crimes related to the vandalism and fire-bombing of four Jewish synagogues and a Jewish community center. Specifically, defendant was convicted of first-degree terrorism, N.J.S.A. 2C:38-2(a); first-degree attempted arson, N.J.S.A. 2C:5-1 and N.J.S.A. 2C:17-1(a); two counts of first-degree conspiracy to commit arson, N.J.S.A. 2C:5-2 and N.J.S.A. 2C:17-1; two counts of first-degree aggravated arson as an accomplice, N.J.S.A. 2C:2-6 and N.J.S.A. 2C:17-1(a)(2); three counts of first-degree bias intimidation as an accomplice, N.J.S.A. 2C:2-6 and N.J.S.A. 2C:16-1(a)(1); three counts of second-degree possession of a destructive device for an unlawful purpose, N.J.S.A. 2C:39-4(c); three counts of third-degree possession of a destructive device, N.J.S.A. 2C:39-3(a); and two counts of fourth-degree bias intimidation, N.J.S.A. 2C:16-1(a)(1).

In a separate published opinion, we analyzed and rejected defendant's constitutional challenges to the New Jersey Anti-Terrorism Act, N.J.S.A 2C:38-1 to -5. State v. Dalal, ___ N.J. Super. ___ (App. Div. 2021). In this opinion, we analyze and reject defendant's additional arguments.

2

# I.

During the four weeks starting on December 10, 2011, and ending on January 11, 2012, five Jewish houses of worship were subject to arson, attempted arson, or vandalism. Following an investigation, defendant and co-defendant Anthony Graziano were charged with multiple crimes related to those acts. We have provided a detailed description of the facts and some of the procedural history in our published opinion. Accordingly, we summarize here some of the additional facts and procedural history relevant to defendant's non-Anti-Terrorism Act-based challenges to his convictions.

During the investigation of the vandalism and arsons, law enforcement personnel identified co-defendant Graziano as a suspect. After collecting additional evidence, they applied for and obtained a search warrant for Graziano's home and his biological fluids. The warrant application sought permission to search "any and all computers" for evidence of motive and the commission of several crimes, including arson and bias intimidation. The warrant authorized the seizure of computers and electronic equipment capable of storing data, as well as their analysis by a qualified forensic specialist. Two laptop computers were seized.

3

In late February 2012, Bergen County Prosecutor's Office (BCPO) Senior Forensic Analyst Andre DiMino completed an analysis of Graziano's computers. The analysis revealed instant message chats between "Dreeper1Up" and "QuantumWorm," discussing the 2011 vandalisms and 2012 arsons. The analysis indicated that Graziano was "Dreeper1Up."

On March 2, 2012, defendant was arrested and charged with several counts of arson, bias intimidation, and criminal mischief. That same day, defendant was interrogated. After waiving his <u>Miranda</u>[1] rights, defendant admitted he was "QuantumWorm" and his involvement in the chats. Defendant also admitted he had encouraged Graziano and acknowledged assisting Graziano in criminal behavior that carried a risk of death because he "thought it was exciting." Nevertheless, defendant denied hating Jewish people and characterized his encouragement of Graziano as "jokes."

Defendant was incarcerated in the Bergen County Jail. In April 2012, a federal judge received a letter from one of defendant's fellow inmates, expressing concern that defendant was planning to attack a federal building. The informant's letter stated he often spoke with defendant and defendant told him "how much he hates the government and the Jewish people."

---

[1] <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966).

A-5556-16

The letter was turned over to the FBI and, thereafter, the informant met with special agents on four occasions in May and June of 2012. During those meetings, the informant described defendant's alleged plan to obtain a gun and murder a Bergen County assistant prosecutor. The informant also provided special agents with papers containing the targeted prosecutor's name and an email address, both written in defendant's handwriting. On June 25, 2012, the FBI alerted the BCPO to the threat. That same day, at the request of the FBI, the informant spoke with defendant while wearing a wire, and the recording captured defendant discussing his efforts to obtain a handgun.

On June 27, 2012, a detective with the BCPO applied for and obtained a warrant to search defendant's jail cell. In the warrant application, the detective described the informant's disclosures to the FBI and the papers believed to have been written by defendant. The recorded conversation between defendant and the informant was also referenced:

> On June 25, 2012, agents with the FBI wired the confidential informant with a recording device to allow for the recording of a conversation between Dalal and the confidential informant. While the totality of the recording has not been completely analyzed, Dalal is heard to discuss with the confidential informant his efforts to obtain a handgun.

A-5556-16

In executing the warrant to search defendant's jail cell, investigators found papers containing the names of BCPO staff and two judges who sit in Bergen County; references to explosives; and notations reading "dead cops, dead cops." Defendant's papers also contained anti-Semitic references and drawings.

In March 2013, a Bergen County grand jury returned a thirty-count indictment, charging both defendant and Graziano with numerous first, second, third, and fourth-degree crimes. Thereafter, defendant filed a series of pretrial motions seeking to suppress the evidence seized from his jail cell; to suppress the instant messages and other computer data seized from Graziano's home; to sever certain charges; and to disqualify the BCPO from handling the case. The State opposed those motions and moved to admit the writings and drawings seized from defendant's jail cell in accordance with N.J.R.E. 404(b).

On April 21, 2016, the trial court issued a written decision on the State's motion. After undertaking an analysis pursuant to State v. Cofield, 127 N.J. 328 (1992), the trial court found "the writings and drawings [were] extremely probative of [defendant's] motive and the admission of such evidence substantially outweigh[ed] the potential prejudice against him." The documents were admitted with redactions, displaying the portions exhibiting

defendant's anti-Semitism, and the court ordered a limiting instruction. Defendant's motion to suppress was denied on August 19, 2016.

Defendant's motion to suppress the instant messages and other items seized from Graziano's home was denied in April 2016. The court found the information contained in the affidavit established probable cause for the search and seizure. The court also found the "any and all computers" language in the affidavit and search warrant were sufficient to establish what could be seized. Consequently, the search of Graziano's computer and the seizure of the data in the computer were deemed lawful.

Defendant was tried before a jury between September 27 and November 1, 2016. The analyst who searched Graziano's computers and discovered the instant messages testified. The State introduced into evidence a report containing the messages in their raw data form. Defense counsel objected, contending the report was "an editorialized document." The trial court overruled defense counsel's objection and instructed the jury that the statements in the chats could only be considered as "evidence of Aakash Dalal and Anthony Graziano's plan, motive, state-of-mind, and identity." The chats could not be used to infer defendant's guilt "just because he has these beliefs."

A-5556-16

Over defendant's objection, several documents seized from defendant's jail cell were admitted and published for the jury's consideration. The trial judge also gave the jury a limiting instruction on those documents, directing that they could only be considered as "evidence of [defendant's] plan, motive, or state-of-mind." The documents and their contents could not be used to infer "that defendant is a bad person and therefore[] must be found guilty[.]"

In total the State presented seventeen witnesses and moved 141 exhibits into evidence. Defendant elected not to testify and called no witnesses. After hearing all the evidence, the jury convicted defendant of nine first-degree crimes, three second-degree crimes, three third-degree crimes, and two fourth-degree crimes.

## II.

In addition to his constitutional challenges to the Anti-Terrorism Act, defendant presents seven arguments:

> Point [I] – THE TRIAL COURT ERRED BY FAILING TO SUPPRESS THE EVIDENCE RETRIEVED FROM AN IMPROPER SEARCH OF MR. DALAL'S JAIL CELL.
>
> A. THE TRIAL COURT ERRED BY FAILING TO SUPPRESS THE EVIDENCE RECOVERED FROM MR. DALAL'S JAIL CELL PURSUANT TO A SEARCH WARRANT OBTAINED THROUGH THE VIOLATION OF

A-5556-16

MR. DALAL'S SIXTH AMENDMENT RIGHTS

1.    THE MASSIAH REQUIREMENTS

2.    THE VIOLATIONS OF MR. DALAL'S RIGHTS UNDER MASSIAH, THE FIFTH AND SIXTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND THE NEW JERSEY CONSTITUTION

B.    THE TRIAL COURT ERRED BY ADMITTING THE JAIL CELL EVIDENCE UNDER RULE 404(b)

Point [II] – THE TRIAL COURT ERRED BY FAILING TO SUPPRESS THE COMPUTER DATA RECOVERED FROM ANTHONY GRAZIANO'S COMPUTER WITHOUT PROBABLE CAUSE[.]

A.    THE WARRANT FOR DEFENDANT ANTHONY GRAZIANO'S COMPUTER LACKED PROBABLE CAUSE AND THE DATA RETRIEVED FROM THE COMPUTER MUST BE SUPPRESSED

B.    THE DATA RECOVERED FROM UNALLOCATED SPACE ON ANTHONY GRAZIANO'S COMPUTER MUST BE SUPPRESSED BECAUSE IT FAILS TO SATISFY THE STANDARDS FOR ADMISSION OF EVIDENCE IN NEW JERSEY

Point [III] – THE TRIAL COURT ERRED BY FAILING TO SEVER THE CHARGES FOR CRIMINAL MISCHIEF AND BIAS INTIMIDATION

FROM THE REMAINING COUNTS FOR ARSON AND TERRORISM.

Point [IV] – THE TRIAL COURT ERRED BY FAILING TO PERMIT MR. DALAL TO REVIEW JUROR QUESTIONNAIRES DURING VOIR DIRE.

Point [V] – THE TRIAL COURT ERRED IN DENYING MR. DALAL'S MOTION FOR A JUDGMENT OF ACQUITTAL[.]

A. MR. DALAL SHOULD HAVE BEEN ACQUITTED OF COUNTS 4 THROUGH 7 OF THE INDICTMENT RELATED TO K'HAL ADATH JERSHURUN [sic]

B. MR. DALAL SHOULD HAVE BEEN ACQUITTED OF COUNTS 8 THROUGH 12 RELATED TO THE JEWISH COMMUNITY CENTER

C. MR. DALAL SHOULD HAVE BEEN ACQUITTED ON THE SIX DESTRUCTIVE DEVICE COUNTS

Point [VI] – THE BERGEN COUNTY PROSECUTOR'S OFFICE MUST BE DISQUALIFIED FROM THIS CASE TO AVOID EVEN THE APPEARANCE OF IMPROPRIETY[.]

Point [VII] – THE TRIAL COURT'S LOSS OF THE VERDICT SHEET IN THIS MATTER REQUIRES THE VERDICT BE VACATED AND THE MATTER REMANDED FOR A NEW TRIAL.

We are not persuaded that any of these arguments warrant the reversal of the jury's verdict and, therefore, we affirm.

10

1.    The Motion to Suppress the Documents Seized from Defendant's Jail Cell.

Defendant contends that the evidence seized from his jail cell should have been excluded on two grounds: Its seizure violated his constitutional rights; and the documents used at trial were inadmissible under N.J.R.E. 404(b).

a.    The Seizure of the Evidence

Defendant argues that his Sixth Amendment right to counsel was violated when a government informant questioned him. Defendant contends that the information the informant gleaned was used to obtain a warrant to search his jail cell. Thus, defendant argues that the documents seized from his cell should have been suppressed as fruits of a poisonous tree. We disagree because there are several factual and legal flaws in the chain of events defendant relies on.

In denying defendant's motion to suppress, the trial court found that the jailhouse informant had been used by law enforcement personnel primarily to investigate separate, new crimes, not to solicit information concerning the vandalism and arsons at the synagogues and Jewish community center. Those findings are supported by substantial credible evidence.

The informant first came to the attention of law enforcement when he wrote to a federal judge about defendant's alleged plot to bomb a federal building. The FBI then interviewed the informant several times and learned of defendant's alleged plots to kill an assistant prosecutor and to obtain a gun.[2] The informant also acquired information from defendant about the vandalism and the arsons at the Jewish houses of worship, but did not do so at the instruction of the FBI. Consequently, the trial court did not find a violation of defendant's Sixth Amendment right. We agree.

The Sixth Amendment to the United States Constitution guarantees criminal defendants the assistance of legal counsel. U.S. Const. amend. VI. That right can attach at various times, but it clearly attaches once adversarial judicial proceedings are initiated, such as when formal charges are brought. Kirby v. Illinois, 406 U.S. 682, 688 (1972); State v. Lenin, 406 N.J. Super. 361, 371-72 (App. Div. 2009).

"Once the right to counsel has attached . . . the State is obliged to honor it." State v. Leopardi, 305 N.J. Super. 70, 77 (App. Div. 1997). Neither law

_____

[2] In August 2013, defendant was indicted for first-degree conspiracy to commit murder, N.J.S.A. 2C:5-2(a)(1) and N.J.S.A. 2C:11-3; second-degree conspiracy to possess an assault firearm, N.J.SA. 2C:5-2(a)(1) and N.J.S.A. 2C:39-5(f); and third-degree terroristic threats, N.J.S.A. 2C:12-3(a). After he was convicted on the earlier charges, the State dismissed the second indictment.

A-5556-16

enforcement personnel nor prosecutors can act "in a manner that circumvents [or] dilutes the protection afforded by the right to counsel." Ibid. (alteration in original) (quoting Maine v. Moulton, 474 U.S. 159, 171 (1985)).

A defendant is denied his Sixth Amendment right when "his own incriminating words . . . [are] deliberately elicited from him after he ha[s] been indicted and in the absence of his counsel" by law enforcement, Massiah v. United States, 377 U.S. 201, 206 (1964), or jailhouse informants working on their behalf, Kuhlmann v. Wilson, 477 U.S. 436, 459 (1986). "[A] defendant does not make out a violation of that right simply by showing that an informant, either through prior arrangement or voluntarily, reported his incriminating statements to the police." Kuhlmann, 477 U.S. at 459. "[T]he Sixth Amendment is not violated whenever — by luck or happenstance — the State obtains incriminating statements from the accused after the right to counsel has attached[.]" Ibid. (quoting Moulton, 474 U.S. at 176).

Instead, defendant "must demonstrate that the police and their informant took some action, beyond merely listening, that was designed deliberately to elicit incriminating remarks." Ibid. In other words, the State must engage in deliberate action to obtain information from defendant regarding the pending

13

charges.  See, e.g., Moulton, 474 U.S. at 176-77; United States v. Henry, 447 U.S. 264, 270-71 (1980); Massiah, 377 U.S. at 202-03.

In addition, law enforcement personnel can investigate new crimes. Consequently, a defendant who has already been charged with certain crimes can be investigated and even questioned about uncharged and unrelated offenses.  McNeil v. Wisconsin, 501 U.S. 171, 175-76 (1991).  Those separate investigations are allowed because the Sixth Amendment right to counsel is "offense specific."  Texas v. Cobb, 532 U.S. 162, 164 (2001); State v. Harris, 181 N.J. 391, 435 (2004).

The trial court found that the jailhouse informant was primarily used to investigate potential new crimes by defendant:  plots to blow up a federal building and to kill an assistant prosecutor.  When the warrant to search defendant's jail cell was sought on June 27, 2012, defendant had not been charged with those new crimes.  Accordingly, his Sixth Amendment right had not attached.

Furthermore, an examination of the application for the warrant to search defendant's jail cell establishes that the focus was on those new crimes. Although there was a reference to the recorded conversation, the full transcript of that conversation was not yet available.  More importantly, we agree with

14

the trial judge that there was sufficient probable cause beyond the conversation to support the warrant to search defendant's jail cell.  See State v. Sullivan, 169 N.J. 204, 210-11 (2001) (recognizing the validity of warrants supported by probable cause, "a 'well grounded' suspicion" that "evidence . . . is at the place sought to be searched").

b.    The Admission of the Documents Seized from Defendant's Jail Cell

Defendant contends that the evidence seized from his jail cell was inadmissible because it was inflammatory and not relevant to a material issue. The trial court granted the State's motion to admit some of that evidence in accordance with N.J.R.E. 404(b).  We review such a ruling for abuse of discretion.  State v. Rose, 206 N.J. 141, 157 (2011).

Our Supreme Court has established a four-part test to guide the admission of evidence under N.J.R.E. 404(b):

> 1.  The evidence of the other crime must be admissible as relevant to a material issue;
>
> 2.  It must be similar in kind and reasonably close in time to the offense charged;
>
> 3.  The evidence of the other crime must be clear and convincing; and

4. The probative value of the evidence must not be outweighed by its apparent prejudice.

[Cofield, 127 N.J. at 338 (quoting Abraham P. Ordover, Balancing the Presumptions of Guilt and Innocence: Rules 404(b), 608(b) and 609(a), 38 Emory L.J. 135, 160 (1989)).]

The trial court carefully applied the four Cofield factors and, as already noted, held the seized writings could be admitted with redactions and a limiting instruction. The trial court's determination did not "rest[] on an impermissible basis," nor was it "based upon a consideration of irrelevant or inappropriate factors." State v. C.W., 449 N.J. Super. 231, 255 (App. Div. 2017) (quoting State v. Steele, 430 N.J. Super. 24, 34-35 (App. Div. 2013)). Accordingly, we discern no abuse of discretion.

Moreover, we must "determine whether any error found is harmless or requires reversal." State v. Prall, 231 N.J. 567, 581 (2018). To warrant reversal, an error must be "of such a nature as to have been clearly capable of producing an unjust result[.]" R. 2:10-2.

We discern no reversible error because the documents admitted into evidence that were seized from defendant's jail cell were at best cumulative. The State presented strong and compelling evidence of defendant's guilt, which came primarily from defendant's own words in the instant messaging chats that he had with co-defendant Graziano. Accordingly, the introduction of the

16

documents seized from defendant's jail cell was at best harmless error.  See

Prall, 231 N.J. at 580; State v. Camacho, 218 N.J. 533, 554-55 (2014)

(considering court's instructions and "the overwhelming evidence produced by

the State," asserted error was harmless); see also State v. Daniels, 182 N.J. 80,

95 (2004) (alteration in original) (quoting State v. Macon, 57 N.J. 325, 336

(1971)) (claimed error must be "sufficient to raise a reasonable doubt as to

whether [it] led the jury to a result it otherwise might not have reached").

2.    The Admission of the IM Chats

Defendant challenges the instant messaging chat evidence on two

grounds.  He contends (1) the seizure of Graziano's computer was illegal

because the warrant lacked probable cause; and (2) the data seized from the

computer was not sufficiently reliable to be admitted into evidence.  We reject

both these arguments.

a.    The Search Warrant

Law enforcement identified Graziano as a suspect after they obtained

security footage from a Walmart depicting him purchasing items used to make

the Molotov cocktails.  Relying on that information, as well as other

information garnered during the investigation, a detective from the BCPO

17

applied for a warrant to search the home where Graziano lived with his parents.

The detective who prepared the affidavit in support of the warrant described the evidence sought as including electronically stored data related to the commission of the suspected crimes, as well as the motive for the arsons. A judge reviewed that application and issued a warrant, finding probable cause for the search of computers and other devices that could store information electronically. Two computers were then seized from Graziano's home.

As already noted, a warrant is lawful if it is supported by probable cause to believe that evidence of a crime is in the place to be searched. Sullivan, 169 N.J. at 210. There is no precise definition of probable cause, but it is based on a "'common-sense, practical standard' dealing with 'probabilities' and the 'practical considerations of everyday life on which reasonable and prudent [persons], not legal technicians, act.'" State v. Evers, 175 N.J. 355, 381 (2003) (quoting Sullivan, 169 N.J. at 211). Consequently, an affidavit seeking a search warrant must present "a fair probability that contraband or evidence of a crime will be found in a particular place." Illinois v. Gates, 462 U.S. 213, 238 (1983). Because "substantial deference must be paid" to a trial court's probable cause determination, "defendant bears the burden of demonstrating

that the warrant was issued without probable cause or that the search was otherwise unreasonable." Evers, 175 N.J. at 381 (citing State v. Valencia, 93 N.J. 126, 133 (1983)).

We hold that there was probable cause to search for computers and other devices that stored electronic information. Graziano was being investigated for arsons at synagogues. It is well-recognized that persons who engage in hate crimes often visit certain websites and communicate with other people who share their views. See United Nations, The Use of the Internet for Terrorist Purposes 5 (2012) (explaining use of the internet "as a means to publish extremist rhetoric . . . develop relationships . . . and solicit support"). It was, therefore, eminently reasonable to search for computers and other electronic equipment in an effort to reveal Graziano's motive for and planning of the arsons.

b.      The Admission of the Chats

A forensic expert examined Graziano's computer and discovered that someone had tried to wipe it clean. Nevertheless, the expert was able to create an image of the computer's hard drive and, using forensic software, search the recovered data. The data included instant messaging chats. The expert found and generated a report with numerous chats between "Dreeper1Up" and

A-5556-16

"QuantumWorm." Some of the messages displayed the date and time that they had been sent. Other messages, however, did not have such information. Moreover, some of the computer's data could not be recovered. Therefore, some of the chats were incomplete.

At trial, defendant objected when the State's expert began to testify. The trial judge overruled that objection and allowed the expert to testify and explain how he had put together the chats. The court also allowed the State to introduce screenshots from the forensic examination software; a report containing the data extracted from the chats; and a "streamlined" copy of messages, with the coding removed. The trial court gave a limiting instruction before allowing the State to introduce the substance of the chats.

"A trial court's ruling on the admissibility of evidence is reviewed on appeal for abuse of discretion." Rose, 206 N.J. at 157. "[C]onsiderable latitude is afforded" to the trial court's evidentiary rulings, and they will be reversed "only if [they] constitute[] an abuse of discretion." State v. Cole, 229 N.J. 430, 449 (2017) (quoting State v. Kuropchak, 221 N.J. 368, 385 (2015)).

We discern no abuse of discretion or error in the admission of the IM chats. The State presented those chats through a forensic expert. Defense counsel made no objection to the expert's qualification as a computer data

recovery expert, despite reserving the right to do so after cross-examination. Consequently, there is a sufficient reliable basis for the admission of the evidence. Defendant's arguments concerning how the information was reconstructed and that some information was missing go to the weight of the evidence. See, e.g., State v. Harvey, 151 N.J. 117, 195 (1997) (after trial court found underlying databases reliable, questions regarding their characteristics went "to the weight of the evidence, not its admissibility"); see also State v. McGuire, 419 N.J. Super. 88, 126-27 (App. Div. 2011) (noting cross-examination and contrary evidence are means of undermining expert testimony); State v. M.J.K., 369 N.J. Super. 532, 549 (App. Div. 2004) (citations omitted) (recognizing a "factfinder may . . . accept some of the expert's testimony and reject the rest . . . even if that testimony is unrebutted").

At trial, the defense challenged the weight and credibility of the IM chats, but apparently the jury rejected those arguments. We discern no error or abuse of discretion that would warrant us to second-guess the jury's factual findings. Harvey, 151 N.J. at 200 (jury may assign "whatever weight it deem[s] appropriate to the expert evidence").

3.    The Motion to Sever

Defendant contends that the charges of criminal mischief and bias intimidation should have been severed from the arson and terrorism charges because by trying them together defendant was prejudiced.

Rule 3:7-6 allows for two or more offenses to be charged together in the same indictment "if the offenses charged are of the same or similar character or are based on the same act or transaction or on [two] or more acts or transactions connected together or constituting parts of a common scheme or plan."  Under Rule 3:15-2(b), "[i]f for any other reason it appears that a defendant or the State is prejudiced by a permissible or mandatory joinder of offenses . . . in an indictment . . . the court may order an election or separate trials of counts[.]"

We review a court's ruling on a severance motion for abuse of discretion. State v. Chenique-Puey, 145 N.J. 334, 341 (1996).  The decision to deny defendant's motion to sever counts at trial "rests within the trial court's sound discretion and is entitled to great deference on appeal."  State v. Brown, 118 N.J. 595, 603 (1990) (first citing State v. Laws, 50 N.J. 159, 175 (1967); and then citing State v. Sanchez, 224 N.J. Super. 231, 245 (App. Div. 1988)). Thus, the "[d]enial of such a motion will not be reversed in the absence of a clear showing of a mistaken exercise of discretion."  State v. Krivacska, 341

N.J. Super. 1, 38 (App. Div. 2001) (citing State v. Rosenberg, 37 N.J. Super. 197, 202 (App. Div. 1955)).

Defendant must demonstrate prejudice.  State v. Moore, 113 N.J. 239, 273-74 (1988) (recognizing more than a "mere claim" is required).  In ruling on a motion to sever, the court should consider the potential harm to the defendant, as well as the need for judicial economy and expediency.  State v. Coruzzi, 189 N.J. Super. 273, 297-98 (App. Div. 1983).  The key to determining whether joinder is prejudicial to a defendant is assessing whether, if the crimes were tried separately, evidence of the severed offenses "would be admissible under [N.J.R.E. 404(b)] in the trial of the remaining charges." State v. Sterling, 215 N.J. 65, 73 (2013) (alteration in original) (quoting Chenique-Puey, 145 N.J. at 341).  "If the evidence would be admissible at both trials, then the trial court may consolidate the charges because 'a defendant will not suffer any more prejudice in a joint trial than he would in separate trials.'"  Chenique-Puey, 145 N.J. at 341 (quoting Coruzzi, 189 N.J. Super. at 299).

Here, we discern no abuse of discretion in the trial court's decision not to sever the charges of criminal mischief and bias intimidation.  We agree with the trial court that the N.J.R.E. 404(b) requirements, as articulated in Cofield,

127 N.J. at 338, were met, and that evidence of the vandalism, arson, and the motive for defendant's actions would have been admissible if defendant had been separately tried on the charges of bias intimidation and criminal mischief. See Krivacska, 341 N.J. Super. at 39. Defendant's motive in committing all the charged offenses was relevant. The crimes also arose out of the same series of events. Moreover, the evidence of all the crimes was sufficiently clear and convincing to be presented together in one trial. Finally, the probative value of the evidence of the various crimes was not outweighed by its apparent prejudice. Consequently, the trial of all the counts was not unduly prejudicial to defendant.

4.    The Jury Voir Dire

Defendant asserts that the trial court committed reversible error by limiting his access to juror questionnaires. During the jury selection process, the State expressed concern about certain pages of the jury questionnaire being given to defendant. The State explained that it had a concern that defendant might try to use biographical information about the jurors to target them, as he had with alleged plots against an assistant prosecutor and certain judges.

The court ruled that defendant would be given the first eight pages of the questionnaire, but not the final three pages, which contained biographical

24

information.  Defendant still had access to that information, however, because it was reviewed during the jury selection process when he was present.

We discern no abuse of discretion or prejudice related to the jury selection process.  Defendant was present during the questioning of prospective jurors and he had access to and could discuss the information with his attorneys.  The only limitation was that he could not physically possess biographical information concerning the jurors.

Moreover, even if we assume this restriction impacted defendant's right to be present and contribute to the jury selection process, such an error is generally subject to a harmless error analysis.  See State v. W.A., 184 N.J. 45, 48, 64 (2005); see also R. 3:16(b).  We hold defendant's restricted access, under the described circumstances, was not "clearly capable of producing an unjust result."  R. 2:10-2.

5.    The Motion for Acquittal

At trial, defendant moved for a judgment of acquittal.  He renews his arguments on appeal.  First, defendant argues that there was no evidence that he had any knowledge of or participated in the planning of the attempted arson at the Jewish temple K'Hal Adath Jeshurun.  Second, he argues that he should have been acquitted on the five counts related to the Paramus Jewish

Community Center.  Finally, he asserts that there was insufficient evidence to convict him of the six counts charging him with possession of destructive devices.

An appellate court reviews the denial of a motion for acquittal de novo, applying the same standard used by the trial judge.  State v. Williams, 218 N.J. 576, 593-94 (2014).  "We must determine whether, based on the entirety of the evidence and after giving the State the benefit of all its favorable testimony and all the favorable inferences drawn from that testimony, a reasonable jury could find guilt beyond a reasonable doubt."  Id. at 594 (citing State v. Reyes, 50 N.J. 454, 458-59 (1967)).  The reviewing court "must consider only the existence of such evidence, not its 'worth, nature, or extent.'"  State v. Brooks, 366 N.J. Super. 447, 453 (App. Div. 2004) (quoting State v. Kluber, 130 N.J. Super. 336, 342 (App. Div. 1974)).

At trial, the State relied on accomplice liability and conspiratorial liability.  Accordingly, the trial judge charged the jury on both vicarious liability theories.

Accomplice liability attaches if defendant shares with the principal actor the same criminal intent and defendant "participated or assisted in the commission of the criminal act."  State v. Daniels, 224 N.J. 168, 179 (2016)

(citing State v. Bielkiewicz, 267 N.J. Super. 520, 528 (App. Div. 1993)); see also State v. Maloney, 216 N.J. 91, 105 (2013); State v. Whitaker, 200 N.J. 444, 457-58 (2009); N.J.S.A. 2C:2-6(c). Accordingly, to be an accomplice, a defendant must have the necessary intent and the State must prove beyond a reasonable doubt that defendant "at least indirectly participate[d] in the commission of the criminal act." Maloney, 216 N.J. at 105 (quoting Whitaker, 200 N.J. at 459); see also State v. Lassiter, 348 N.J. Super. 152, 162-63 (App. Div. 2002).

Conspiratorial liability is imposed for "the acts of others that constitute a reasonably foreseeable risk arising out of the criminal conduct undertaken to effectuate [a] conspiracy, and occurring as the necessary or natural consequences of the conspiracy." State v. Bridges, 133 N.J. 447, 468 (1993). "[C]onspirators are treated as accomplices under N.J.S.A. 2C:2-6, and hence are guilty of the same substantive offense[s] as the principal." State v. Cagno, 409 N.J. Super. 552, 577 (App. Div. 2009) (quoting State v. Taccetta, 301 N.J. Super. 227, 243 (App. Div. 1997)); see also State v. Schmidt, 110 N.J. 258, 259, 273 (1988) (explaining State's proofs in a given case may "sustain [a defendant's] liability for possession as an accomplice or conspirator," even

where defendant never possessed the prohibited item); State v. Roldan, 314 N.J. Super. 173, 188 (App. Div. 1998) (acknowledging same).

The evidence presented during defendant's trial allowed the jury to reasonably find that defendant was guilty of all the charges beyond a reasonable doubt. In that regard, the communications between defendant and co-defendant Graziano were evidence that they were involved in an ongoing conspiracy. The instant messaging chats between defendant and Graziano allowed the jury to conclude that defendant intended Graziano carry out the two arsons and attempted arson, and that he promoted or facilitated Graziano's crimes. Indeed, defendant acknowledged that he "egged" Graziano on.

The evidence at trial also allowed the jury to reasonably conclude that defendants were in a conspiracy to commit arson and to fire-bomb synagogues. Defendant acknowledged that he told Graziano to look for instructions on preparing Molotov cocktails online. During their chats, defendant and Graziano then discussed using Molotov cocktails on the three synagogues. Regarding the Rutherford synagogue, defendant advised Graziano that he should first throw a large rock through a window and then throw a Molotov cocktail. That evidence allowed the jury to find beyond reasonable doubt that

defendants were in a conspiracy and, therefore, defendant could be guilty of all the charges that were submitted to the jury.

6.    The Motion to Disqualify the BCPO

Next, defendant argues that the trial court erred by failing to disqualify the entire Bergen County Prosecutor's Office from this case after defendant was charged with conspiracy to murder a BCPO assistant prosecutor. Defendant asserts that there was an appearance of impropriety and that reasonable persons could doubt the BCPO's ability to be objective and fair. We disagree.

We review disqualification issues de novo. City of Atlantic City v. Trupos, 201 N.J. 447, 463 (2010). "Attorneys who serve as counsel for governmental bodies must avoid not only direct conflicts of interests, but any situation which might appear to involve a conflict of interest." In re Op. No. 415, 81 N.J. 318, 324 (1979) (citation omitted). Following amendments to the Rules of Professional Conduct in 2004, our Supreme Court generally abandoned the "appearance of impropriety" standard as too vague a criterion for evaluating a disqualifying conflict of interest. In re Sup. Ct. Advisory Comm. on Pro. Ethics Op. No. 697, 188 N.J. 549, 552, 568 (2006); State v. Hudson, 443 N.J. Super. 276, 288 (App. Div. 2015). Nevertheless, courts

retain the authority "to take corrective action when the risk of improper conflict threatens the administration of justice." State v. Faulcon, 462 N.J. Super. 250, 256-57 (App. Div. 2020) (quoting Sup. Ct. of N.J., Administrative Determinations in Response to the Report and Recommendation of the Supreme Court Commission on the Rules of Professional Conduct, comm'n cmt. on RPC 1.7 (Sept. 10, 2003), reprinted in Michels, New Jersey Attorney Ethics, Appendix A1 at 1250 (2020)).

We discern neither an appearance of impropriety nor a conflict of interest in the BCPO handling the case against defendant and Graziano. The BCPO removed the assistant prosecutor who was actually threatened and he did not try the case. We believe that cured any potential appearance of impropriety or conflict of interest. To rule otherwise would allow defendants to make threats against a prosecutor's office and then require the matter to be shifted to another prosecutor's office or to the Office of the Attorney General.

Prosecutors and assistant prosecutors hold the responsibility to indict and prosecute crimes involving many different types of criminal activity. In exercising that responsibility, prosecutors and assistant prosecutors are sometimes threatened or implicitly threatened by defendants or people acting in concert with defendants. Accordingly, to warrant disqualification, there

A-5556-16

must be a showing of a real ground for questioning the entire prosecutor's office's appearance of impropriety or a conflict of interest. See State v. Harvey, 176 N.J. 522, 529 (2003); see also State v. Irizarry, 271 N.J. Super. 577, 593-601 (App. Div. 1994) (declining to disqualify entire prosecutor's office where one staff member was likely to be a necessary witness). That standard does not depend on the actions or threats of the defendant; rather, it focuses on the actions or omissions of the prosecutor's office. See Irizarry, 271 N.J. Super. at 591-92. Here, there is nothing in the record to question the impartiality of the entire BCPO, nor is there a conflict of interest.

7.    The Verdict Sheet

Finally, defendant contends that the verdict sheet was lost and, therefore, he is not able to determine the factual basis for the jury's determination on his convictions and, in particular, the terrorism convictions.

This argument lacks merit. The jury returned its verdict on the record. The foreperson confirmed that the verdict was unanimous. The trial court then reviewed with the foreperson each of the charges and the foreperson, on the record, announced the jury's verdict. With regard to the charge of terrorism, the foreperson confirmed the jury unanimously found defendant guilty as to

the third scenario listed on the verdict sheet.  The jury was then polled, and they all confirmed their unanimous verdicts.

Moreover, we note that it is not clear on the record presented to us why the jury verdict sheet could not be located.  What is clear, however, is that the jury announced its verdict consistent with the verdict sheet and if needed the trial court could reconstruct and settle that part of the record.  See R. 2:5-5.

In summary, we have evaluated but rejected all of defendant's arguments challenging the jury verdict.  Accordingly, all his convictions are affirmed.

Affirmed.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

A-5556-16